# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

MITCHELL RAY LANGEL,

       Petitioner,

vs.

JERRY BURT, Warden,

       Respondent.

No. C05-0017-MWB

**REPORT AND RECOMMENDATION
ON PETITION FOR WRIT OF
HABEAS CORPUS**

_____

     This matter is before the court on a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, filed by the petitioner Mitchell Ray Langel on January 27, 2005. (Doc. No. 1) Langel is an inmate at the Anamosa State Penitentiary in Anamosa, Iowa. In November 1999, he was convicted in Linn County, Iowa, of attempted murder and willful injury, in violation of Iowa Code §§ 707.11, 708.4, and 902.7. He was sentenced to indeterminate terms not exceeding twenty-five and ten years, respectively, with the sentences to run concurrently. Langel filed a direct appeal and an application for post-conviction relief, both of which were denied.

     In this action, Langel asserts his trial counsel was ineffective in two ways. First, he claims his attorney erred in failing to require the trial court to advise Langel of, and make inquiry with respect to, his waiver of jury trial and consent to trial by the court. Second, he claims trial counsel erred in failing to argue that Langel acted in self defense.

     The parties have briefed the issues fully (*see* Doc. Nos. 16, 19, & 20), and the matter is ripe for consideration on the merits.

## BACKGROUND FACTS

     The following background facts are pertinent to the present inquiry. Except where stated otherwise, these facts are taken from the opinions on Langel's direct appeal, *State*

*v. Langel*, 2001 WL 355821 (Iowa Ct. App. Apr. 11, 2001) ("Langel I"); post-conviction relief, *Langel v. State*, No. PCCV042682 (Linn County Dist. Ct. Sept. 19, 2003) ("Langel PCR"); and appeal from the denial of post-conviction relief, *Langel v. State*, 690 N.W.2d 697 (table), 2004 WL 1812730 (Iowa Ct. App. 2004) ("Langel II"); all three of which are attached as addenda to the respondent's brief on the merits (Doc. No. 19). The facts as found by the State courts are presumed to be correct, absent rebuttal by Langel by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Langel has a history of mental health problems, including a diagnosis of bipolar disorder in 1989, for which he was hospitalized. In November 1998, Langel's mother became concerned by Langel's behavior. She obtained a court order authorizing Langel's involuntary commitment to a psychiatric facility. (*See* Doc. No. 16, p. 10, citing Trial Tr. at 416, 428) On November 19, 1998, Langel's mother called the Linn County Sheriff's Office and advised officers she believed Langel intended to commit suicide, and that he was in his apartment with a shotgun. Linn County Sheriff's Deputies went to Langel's apartment to serve him with the civil commitment papers. Officers from the Cedar Rapids Police Department were present at the scene to assist the deputies.

When they arrived, Langel refused to answer the door or respond to the officers. The officers, as well as Langel's friends and relatives, made numerous efforts to talk with Langel and get him to come out of the apartment but Langel refused to do so. When it began to get dark, Langel made a comment that "things will happen" after dark. After several hours of attempting to talk with Langel, police officer Philip Peters and a sheriff's deputy entered a crawlspace in the attic above Langel's apartment to establish surveillance. They discovered an access door from the attic into Langel's bedroom and decided to enter the apartment to obtain better surveillance. They lowered a ladder from the crawlspace into the bedroom (*see* Trial Tr. at 73-74), and Peters descended into the bedroom, followed by the deputy. The apartment was dark, and Langel detected the officers'

presence, apparently from seeing light from the officers' flashlights. Peters heard Langel yell, "I told you not to send your people in here," and "I know you're back there." (Trial Tr. at 159)

Peters testified he had to make a choice at this point regarding what to do next. He believed that if the officers attempted to go back up the ladder and Langel came into the bedroom with a gun, it would be difficult for them to defend themselves. He knelt down and opened the bedroom door, and immediately saw Langel, who was sitting on a couch in the living room. (Trial Tr. at 160-61) Langel appeared to be holding a can of pop in one hand and a magazine in the other hand. Peters did not see a firearm, and he did not see Langel make any movements. (Trial Tr. at 162, 164)

Peters, who was dressed all in black, drew his handgun and approached Langel, shining the flashlight on Langel's face. About two-thirds of the way down the hallway, Peters's knees buckles and he stumbled, he believes because he had been in a squatting position for several minutes. When Peters stumbled, his flashlight went off. He stood back up and turned the flashlight back on, and as he did so, he heard a loud blast and felt an impact on his face. (Trial Tr. at 163, 165) Langel had fired a single shotgun blast which hit Peters in the face, blinding him in one eye. Other officers placed Langel under arrest, and he was charged with attempted murder and willful injury. Later analysis showed the bulk of the shotgun pellets had hit Peters's gun and his hand, with fewer of the shotgun pellets hitting the rest of Peters's body and his face.

Langel retained attorney Alfredo Parrish to represent him. Mr. Parrish filed notice that Langel would assert the affirmative defense of diminished capacity, and Langel was evaluated by his own retained psychologist and by a psychologist for the State. During pretrial preparations, one of Mr. Parrish's associates discussed the jury selection process with Langel, and talked with him about what types of jurors Langel would like to have on his jury. (PCR Tr. at 17-18) On the morning of trial, September 17, 1999, Mr. Parrish

first presented Langel with the idea of waiving a jury and trying the case to the court. According to Langel, he was confused about what to do. Mr. Parrish told him had discussed the matter with another attorney, and had noted the fact that the trial judge formerly was a defense attorney and had defended a couple of diminished capacity cases. According to Langel, Mr. Parrish stated he was confident that a bench trial would be in Langel's best interests. In addition, Mr. Parrish consulted with another defense attorney, Leon Spies, who had represented Langel on other matters in the past, and Mr. Spies agreed a bench trial was appropriate in this case. (PCR Tr. at 19-23) At Langel's PCR trial, he testified he trusted Mr. Spies, and "if Mr. Spies thought it was a good idea and Mr. Parrish thought it was a good idea, [he] was fine with it." (PCR Tr. at 23)

Langel agreed ("perhaps somewhat hurriedly," as noted by the PCR court) to waive a jury and try the case to the court. The following record was made at the beginning of the trial:

> THE COURT: We are on the record in the Iowa District Court for Linn County in case number FECR 28421, State of Iowa versus Mitchell Ray Langel. The matter is set for trial this morning, and the Court is advised by counsel that counsel for the Defendant wishes to make a record before the jury is present.
>
> You may proceed, Mr. Parrish.
>
> MR. PARRISH: Thank you, Your Honor. May it please the Court and Mr. Vander Sanden. At this time, Your Honor, I have had some discussions with my client about the trial of this matter, and it's our desire to waive a jury trial and try the case to the Court. But what we would like to do is make some record with regard to Mr. Langel's consent to that matter for the Court for the purposes of making a record to see that he fully understands the waiver and the effect of that waiver, Your Honor. Would you like me [to] do it from here or would you like him to come forward?
>
> THE COURT: He may come forward and we'll place him under oath.

MR. PARRISH: Thank you, Your Honor.

(Trial Tr. at 7)  Langel was sworn, and the following colloquy took place between Langel and Mr. Parrish:

Q    [By Mr. Parrish]  State your name and spell both your first and your last name for the record please.

A    My name is Mitchell Ray Langel.  M I T C H E L L.  Langel, L A N G E L.

Q    How old are you?

A    32.

Q    Where did you go to school?

A    I completed my Bachelor of Arts degree in economics at the University of Iowa.

Q    What year was that?

A    1991.

Q    You're presently on medications as you sit here today, is that correct?

A    Correct.

Q    Have I asked you about the medication?

A    Yes, you have.

Q    Did you take your medication this morning before you left the jail?

A    No.  Last night would be the last time I took it.  I take it at night.

Q    Approximately what time last night?

A    Nine o'clock.

Q    And explain to the Court what that medication is?

A    It's Haldol.

Q      And what was the amount of medication that you took last night if you can recall?

A      Five milligrams.

Q      And explain the effect of – the Haldol has on you once you take it?

A      It just – It's an antipsychotic and makes me kind of tired and relaxes me.

Q      As you sit here today, did you understand all of the discussions I had with you about waiver of the jury trial?

A      Yes, I did.

Q      Were both your mother and father here for that discussion?

A      Yes, they were.

Q      Tell us for the record who your – what his name is and where he is in the courtroom, point him out to me please.

A      His name is Charles Langel.  He's right there in the front row (indicating).

Q      Tell us what your dad is wearing?

A      He's wearing a blue jacket, blue and white pin-striped shirt.

Q      Did he have an opportunity with the deputies' permission to come up and sit by us when we were discussing this?

A      Yes, he did.

Q      Okay.  And tell me who else was here during that discussion?

A      My mother and Matthew Dake.

Q      And – Okay.  And where is your mom seated?

A      Right there in the front row (indicating).

Q      What is she wearing?

A      Kind of a khaki blazer and a dark-colored shirt.

Q      Okay.  And what's your mom's name?

A      Lennora Steinbronn.

Q    And who is the other gentleman who was here?

A    Matthew Dake.

Q    And who is Matthew Dak?

A    He's also my attorney.

Q    He's an associate in my farm [sic], is that correct?

A    Yes, that's correct.

Q    And you met with Mr. Dake a couple times over the weekend, is that correct?

A    Yep.

Q    Now, I want to ask you with regard to the – Well, strike that. Are you on any other type of medication other than Haldol at the present time?

A    No, I'm not.

Q    Did you have breakfast this morning?

A    Yes, I did.

Q    What did you have for breakfast?

A    Cereal and toast.

Q    Okay.  Did you have anything to drink this morning?

A    Milk.

Q    All right.  You understand that by waiving a jury trial that one person, that is the Judge, would make a decision with regard to all the factual issues in this case?  Do you understand that?

A    Yes, I do.

Q    Did I explain that to you?

A    Yes, you did.

Q    Did I explain to you also the fact that all the legal issues in this case would be decided by the same Judge who would make – who would be the fact-finder in the case?

A   Yes, you did.

Q   All right. Did I explain to you also by waiving the jury trial twelve people would no longer participate in this case at all? Do you understand that?

A   Yep.

Q   And that means that with the twelve jurors you understand that all twelve would have to agree before there would be a conviction in your case? Do you understand that? Did I explain that to you?

A   Yep.

Q   Do you understand that?

A   Yep.

Q   Did I explain to you that if one juror disagrees with the other eleven jurors that the State would not have a unanimous verdict and, consequently, could not get a conviction against you in this case?

A   Yes.

Q   Okay. Do you understand and have I explained to you in the past and also today the charge that you are presently facing?

A   Yes.

Q   Do you realize the charge is an attempted murder charge?

A   Yes, I do.

Q   And do you understand in Iowa if there is a conviction on attempted murder cases, it's an 85 percent crime, meaning you would have to serve 85 percent of the sentence before you are entitled to parole of any sort? Or release of any sort. You understand that?

A   Yes, I do.

Q   Now, you also understand that with a jury trial you would have an opportunity to voir dire the jury. We have an opportunity to ask them questions about their feelings; basically the issue in this case, the diminished capacity; also their

relationship with law enforcement officers; all of this type of thing? You understand that?

A    Yes.

Q    Did I explain that to you where you could fully understand that?

A    Yes.

Q    Do you have any questions about the right you are giving up and waiving a jury trial?

A    No, I don't.

Q    Do you wish to waive the jury trial in this case?

A    Yes, I do.

Q    Is this waiver upon advice of counsel and also being done voluntarily because you have had an opportunity to think through this case and also meet with your parents concerning this case?

A    Yes.

Q    Is that correct?

A    That is correct.

Q    And at this time what is your desire with regard to whether or not you waive the jury trial in this case and not go forth with a jury trial?

A    I would like to waive the jury trial.

        MR. PARRISH: Your Honor, I have no further questions in this matter.

(Trial Tr. at 8-14)

The prosecutor did not cross-examine Langel on the issue of his jury waiver. The court accepted Langel's waiver of his constitutional right to a jury trial, and the case proceeded to trial to the court. (Trial Tr. at 14) The court took a recess, and when court reconvened, the following colloquy took place between counsel and the court:

THE COURT: We are back on the record in State v. Langel following our morning recess. We had earlier this morning made a record about Defendant's waiver of his right to a jury trial in the matter.

Mr. Parrish, has the Defendant and have you signed th written waiver of jury trial?

MR. PARRISH: Yes, Your Honor. I have reviewed the waiver given to me and reviewed it with Mr. Langel, explained it to him again and I have put my signature on it, and also Mr. Langel has put his signature on it.

THE COURT: Thank you. The record will show that the Court has received the waiver of jury trial signed by Defendant and his counsel, and this will be filed in the court file with the Clerk of Court.

One additional matter to place on the record concerning waiver of jury trial is the State's consent. Mr. Vander Sanden, does the State consent or resist Defendant's waiver of his right to jury trial?

MR. VANDER SANDEN: The state consents, Your Honor.

THE COURT: Very well. . . .

(Trial Tr. at 16-17)

Trial proceeded to the court. Langel presented a defense of diminished capacity. The court found Langel guilty on both counts and sentenced him to twenty-five years on the attempted murder count and ten years on the willful injury count, with the sentences to be served concurrently.

## STATE COURT OPINIONS

As noted above, Langel raises arguments in the present action that Mr. Parrish provided him ineffective assistance because (1) Mr. Parrish did not require the trial court to advise him, and to inquire of him regarding his understanding, of the rights he would be relinquishing in waiving a jury trial; and (2) Mr. Parrish failed to argue Langel acted

in self defense. These issues were considered, and rejected, by the PCR court, and by the Iowa Court of Appeals on appeal from the denial of PCR relief.

The PCR court first set forth the standard for a defendant to prevail on an ineffective assistance of counsel claim, citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See* Langel PCR at 3. The PCR court then ruled as follows on Langel's two assertions that his counsel was ineffective:

I.    Waiver of Jury Trial

Mr. Langel relies on State v. Stallings, 658 N.W.2d 106, 111-12 (Iowa 2003), to support his claim that his trial counsel was ineffective in allowing him to waive his right to a jury. Stallings involves the same claim by a defendant whose 2001 waiver of jury trial was not on the record, nor was there a written document executed by defendant. 658 N.W.2d at 108.

The Iowa Supreme Court in Stallings adopts the four requirements of a jury waiver found in United States v. Robertson, 45 F.2d 123, 1432 (10th Cir. 1995).

Defendants should be informed that:

1)    12 members of the community compose a jury;
2)    a defendant may participate in jury selection;
3)    jury verdicts must be unanimous; and,
4)    the court alone decides guilt or innocence if the jury is waived.

658 N.W.2d at 110, citing Robertson, 45 F.3d at 1432.

The trial transcript here demonstrates that Mr. Langel testified that he understood all four Stallings/Robertson factors. Transcript, pp. 11-13. Mr. Langel testified at the post-conviction trial that he thought the jury decided by majority voted, and [he] did not realize until after his trial that the jury had to be unanimous. However, the colloquy between Mr. Langel and Mr. Parrish, on page 12 of the trial transcript, demonstrates that Mr. Parrish told Mr. Langel that all twelve jurors would have to agree before there would be a conviction,

and that one juror could prevent unanimity. Mr. Langel's trial counsel was not asked about specific off-the-record information he may have given to Mr. Langel about the waiver.

Stallings also includes the admonition that a court should determine whether a defendant has the erroneous impression that he will be rewarded by the court or prosecution for waiving a jury trial. 658 N.W.2d at 111-12. Nothing in Mr. Langel's testimony at the post-conviction hearing suggests that he believed he would be rewarded for his waiver.

The Iowa Supreme Court has warned against a rigid application of the Stallings decision. 658 N.W.2d at 110. Here, however, the waiver colloquy occurred with the Defendant under oath, on the record, and buttressed by a written, personally executed waiver. The fact that the colloquy was conducted by defense counsel rather than the Court is form over substance. Mr. Langel has a college education, had not received any medication since the evening before trial, and makes no claim that his thought processes were altered or confused.

Mr. Langel has failed to show that his jury waiver was defective, or that counsel acted outside the range of competence. Therefore, the Court need not reach other issues regarding the failure to raise the issue on direct appeal, whether the Stallings decision is retroactive, or whether Mr. Langel suffered prejudice as a result of his jury waiver.

.   .   .

III.    The Affirmative Defense of Justification

Mr. Langel complains that his attorney was ineffective in failing to raise the affirmative defense of justification, as an alternative defense to diminished responsibility.

Defense counsel testified in his deposition that it was possible to argue justification and diminished capacity in the alternative. However, the self-defense claim was not compelling, in counsel's opinion, because the officers,

12

relatives and friends had been pleading with Mr. Langel for hours to put his gun down and come out of the apartment. Justification was not a strong claim, particularly in comparison to the diminished responsibility defense that had support even from State experts.

Counsel's decision not to assert a weaker, alternative defense was a decision of trial strategy well within the range of competence.

Here, Mr. Langel was represented by experienced, prepared and skillful counsel. No deficiency identified by Mr. Langel in the trial process is claimed to be a lack of diligence or investigation. Rather, defense counsel made a strategic decision to concentrate on Mr. Langel's strongest claim, his mental condition. Defense counsel weighed the risks and benefits of a jury trial, conferred with local counsel, and made the decision that Mr. Langel's best chance was with a judge, and particularly with the judge that had been assigned to conduct the trial. The outcome was disappointing to defense counsel and to Mr. Langel, but it did not result from ineffective representation of counsel.

Langel PCR at 3-6.

On appeal, the Iowa Court of Appeals held as follows on these claims:

A. Langel first claims his trial counsel should have required the trial court to engage in a colloquy with him to ensure that he made a knowing, intelligent, and voluntary waiver of his right to a jury trial. In *State v. Liddell*, 672 N.W.2d 805, 812 (Iowa. 2003), the supreme court determined that an in-court colloquy will be required prior to a waiver of the right to a jury trial. This decision, however, was not made retroactive. *Liddell*, 672 N.W.2d at 814. Here, Langel waived his right to a jury trial in September 1999, long before *Liddell* was decided. Counsel should not be considered ineffective for failing to foresee a change in the law. *Id*.

We consider the performance of defense counsel under the law in effect at the time Langel waived his right to a jury trial. *See State v. Miranda*, 672 N.W.2d 753, 763 (Iowa

2003). Iowa Rule of Criminal Procedure 2.17(1) "provides, Cases required to be tried by jury shall be so tried unless the defendant voluntarily and intelligently waived a jury trial in writing. . . ." Previously, where there has been a written waiver of the right to a jury trial, the waiver has been upheld whether or not there was an in-court colloquy. *State v. Buck*, 510 N.W.2d 850, 854 (Iowa 1994).

.   .   .

We concur in the district court's assessment. Langel has failed to show he received ineffective assistance of counsel in regard to the waiver of his right to a jury trial.

B. Langel also claims his trial counsel should have raised a defense of justification or self-defense. Section 704.3 provides, "[a] person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." Langel now claims he was justified in shooting at Peters because he believed an unknown assailant was in his apartment.

"Counsel's duty to investigate and prepare a defense is not limitless and does not require counsel to pursue each possible witness and delve into every line of inquiry." *Van Hoff v. State*, 447 N.W.2d 665, 670 (Iowa Ct. App. 1989) (citing *Heaton v. State*, 420 N.W.2d 429, 431 (Iowa 1988)). When counsel makes a reasonable tactical decision regarding which defense to present at trial, we will not engage in second-guessing on appeal. *Id.* (citing *Fryer v. State*, 325 N.W.2d 400, 413 (Iowa 1982)).

.   .   .

We agree with the district court's conclusion that defense counsel was not ineffective for raising only the stronger defense, diminished responsibility, and not arguing an alternative, weaker defense, justification. Langel was well

> aware that police officers had surrounded his apartment and
> wanted him to come out. It is disingenuous for him to claim
> that he acted in self-defense.

*Langel II*, 2004 WL 1812730, at *2-3.


## *STANDARD OF REVIEW*

For a petitioner to prevail on an ineffective assistance of counsel claim, he ordinarily must satisfy the two-pronged test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In *Strickland*, the U.S. Supreme Court held that to prevail on a claim for ineffective assistance of counsel:

> *First,* the defendant must show that counsel's performance was
> deficient. This requires a showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. *Second*,
> the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable. Unless a defendant makes
> both showings, it cannot be said that the conviction . . .
> resulted from a breakdown in the adversary process that
> renders the result unreliable.

466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984) (emphasis added).

Furthermore, in a habeas action, the petitioner must do more than satisfy the *Strickland* "performance" and "prejudice" tests. In addition, the habeas petitioner must show the decision of the state court on the issue "was either (1) 'contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor*, 529 U.S.

362, 404-05, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)).

Under the first category, a state-court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*, 529 U.S. at 405, 120 S. Ct. at 1519. The Court explained:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.

*Id.*, 529 U.S. at 412-13, 120 S. Ct. at 1523. Further, "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." *Id.*, 529 U.S. at 412, 120 S. Ct. at 1523.

The second category, involving an "unreasonable application" of Supreme Court clearly-established precedent, can arise in one of two ways. As the Court explained:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.*, 529 U.S. at 407, 120 S. Ct. at 1520 (citing *Green v. French*, 143 F.3d 865, 869-70 (4th Cir. 1998)). Thus, where a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," that decision "certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established federal law.'" *Id*, 529 U.S. at 407-08, 120 S. Ct. at 1520. Notably,

> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.*, 529 U.S. at 411, 1250 S. Ct. at 1522.

If the state court decision was not contrary to clearly established federal law, as determined by the Supreme Court of the United States, and if it did not involve an unreasonable application of that law, then the federal court must determine whether the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Thus, to prevail here, Langel must show the Iowa Court of Appeals either (1) reached a decision contrary to applicable Supreme Court precedents on a question of law; (2) correctly identified the applicable law, but then failed to apply the law reasonably to the facts of this case; or (3) made its decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

## ANALYSIS

### A. Waiver of Jury Trial

Controlling Supreme Court precedent provides that "an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury. . . . There is nothing in the Constitution to prevent an accused from choosing to have his fate tried before a judge without a jury. . . ." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 63 S. Ct. 236, 240, 87 L. Ed. 268 (1943). The Supreme Court considered at length whether a defendant may waive the constitutional right to jury trial in *Patton v. United States*, 281 U.S. 276, 50 S. Ct. 253, 74 L. Ed. 854 (1930), *abrogated on other grounds by Williams v. Florida*, 399 U.S. 78, 90 S. Ct. 1893, 26 L.

Ed. 2d 446 (1970). In affirming a defendant's right to waive a jury trial, the Court held as follows:

> Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. In such cases the value and appropriateness of jury trial have been established by long experience, and are not now to be denied. Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.

*Patton*, 281 U.S. at 312-13, 50 S. Ct. at 263; *see Florida v. Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551, 560, 160 L. Ed. 565 (2004) (defendant has "the ultimate authority" to determine whether to waive a jury); *Dranow v. United States*, 325 F.2d 481 (8th Cir. 1963).

"To preserve the fairness of the trial process the Court [has] established an appropriately heavy burden on the Government before waiver [can] be found – 'an intentional relinquishment or abandonment of a known right or privilege.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 236-37, 93 S. Ct. 2041, 2052, 36 L. Ed. 854 (1973). The Court has applied the requirement of a knowing and intelligent waiver "only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.*, 412 U.S. at 237, 93 S. Ct. at 2052-53. This includes assessing the effectiveness of a waiver of the right to a jury trial. *Id.* (citing *Adams*, *supra*). "[W]hether or not there

is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *Adams*, 317 U.S. at 278, 63 S. Ct. at 241.

The Eighth Circuit has held a defendant may waive the right to jury trial if the waiver is "express and intelligent," and both the government counsel and the court sanction the waiver. *United States v. Mahler*, 141 F.3d 811, 814 (8th Cir. 1998). The *Mahler* court further noted, "The Supreme Court has never mandated a written requirement for such waivers." *Id.*

In 2003, the Iowa Supreme Court held that Iowa Rule of Criminal Procedure 2.17(1) "requires the court to conduct an in-court colloquy with defendants who wish to waive their jury trial rights." *State v. Liddell*, 672 N.W.2d 805, 811-12 (Iowa 2003). "The court in *Liddell* found that the 'on the record' language from rule 2.17(a) requires some in-court colloquy or personal contact between the court and the defendant to ensure the defendant's waiver is knowing, voluntary, and intelligent." *State v. Conger*, slip op., 2006 WL 469174 (Mar. 1, 2006) (citing *Liddell*, 672 N.W.2d at 812). PCR court in Langel's case noted that the *Liddell* decision was not made retroactive, and Langel's waiver of his right to a jury trial took place in September 1999, "long before *Liddell* was decided. Counsel should not be considered ineffective for failing to foresee a change in the law." Langel PCR, 2004 WL 1812730, at *2. However, the PCR appellate court's decision is fully in line with the holding in *Liddell*, in which the Iowa Supreme Court *upheld* a jury waiver where the trial court *did not* conduct its own in-court colloquy. In *Liddell*, as in Langel's case, the defendant had signed a written waiver that was part of the record before the court. The written waiver included language informing the defendant of his right to a jury trial, the requirement of a unanimous verdict beyond a reasonable doubt, and the fact that a judge alone would decide his guilt or innocence if he waived a jury trial. The court held Liddell's written waiver was "prima facie evidence his waiver was voluntary, knowing, and intelligent." *Liddell*, 672 N.W.2d at 811. Furthermore, the

court held the defendant, not the government, bore the burden "to show his waiver was not knowing, voluntary and intelligent[.]" *Id.* The court therefore held Liddell's trial counsel had not breached an essential duty, and denied Liddell's ineffective assistance of counsel claim. It was only after concluding this analysis that the Iowa Supreme Court went on to examine its previous precedents, and to hold that thereafter, rule 2.17(1) would require "some in-court colloquy with the defendant . . . in order to ensure the defendant's waiver is knowing, voluntary, and intelligent." *Liddell*, 672 N.W.2d at 814. As the PCR court recognized in Langel's case, the *Liddell* court recognized Liddell's counsel could not be found ineffective for failing to "be a crystal gazer"; the court noted counsel need not be able to predict how the law would change in the future in order to provide effective assistance of counsel. *Id.*

A similar result is appropriate here. Like the PCR court, the undersigned finds Langel's objection that his waiver colloquy was conducted by his attorney rather than by the court is form over substance. Langel evidenced both orally and in writing that he understood the difference between a jury trial and a bench trial, and his waiver was voluntary, knowing, and intelligent. Mr. Parrish recommended the bench trial as a tactical matter, and Langel accepted the recommendation. The court finds Mr. Parrish's performance was not ineffective, and Langel has failed to show otherwise. Further, and more importantly here, Langel has failed to show the decision of the state court was contrary to Supreme Court precedent, or involved an unreasonable application of clearly-established federal law. Accordingly, Langel's claim for relief on this issue should be denied.

### B. Failure to Assert Justification Defense

Langel argues he essentially was "denied counsel because his trial counsel was ineffective when he failed to argue that Mr. Langel acted in self-defense. In fact, [counsel]

went so far as to tell the Court in closing arguments that '[t]his case is not about self-defense.'" (Doc. No. 16, p. 24)  He argues Mr. Parrish should have asserted both the defense of diminished responsibility and the defense of justification/self-defense. (*Id.*, pp. 24-25)

Iowa law provides that "[a] person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." Iowa Code § 704.3.  The Iowa Code defines "reasonable force" as

> that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.  Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.

Iowa Code § 704.1.

The Respondent argues the circumstances in the present case prove this defense was not reasonably available to Langel, thus defeating any claim that he was prejudiced by his counsel's failure to assert the defense. (*See* Doc. No. 19, pp. 15-19) .  However, the court finds it is not necessary to reach the prejudice prong because Langel cannot meet the heavy burden of showing his counsel's performance was deficient.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955)).  "Reasonable

trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." *James v. Iowa*, 100 F.3d 586, 590 (8th Cir. 1996). A petitioner must satisfy both prongs of *Strickland* in order to prevail on an ineffective assistance of counsel claim. *See Strickland.*, 466 U.S. at 687, 104 S. Ct. at 2064. It is not necessary to address the performance and prejudice prongs in any particular order, nor must both prongs be addressed if the district court determines the petitioner has failed to meet one prong. *Id.*, 466 U.S. at 697, 104 S. Ct. at 2069.

In Mr. Parrish's deposition in connection with Langel's PCR action, he testified he had made "a substantial review of [the] issue" before deciding not to proceed on a self-defense theory. *See* Deposition of Alfredo Parrish dated July 16,2003, at pp. 30-31 (Doc. No. 17-2, p. 64). As the PCR court noted and the PCR appellate court affirmed, "The self-defense claim was not compelling, in counsel's opinion, because the officers, relatives and friends had been pleading with Mr. Langel for hours to put his gun down and come out of the apartment. . . . Counsel's decision not to assert a weaker, alternative defense was a decision of trial strategy well within the range of competence." Langel PCR, 2004 WL 1812730 at *3. Although there were other trial strategies available, including assertion of the defense of self-defense, the court finds Langel's trial counsel was not ineffective in deciding to concentrate on the strongest of Langel's defenses, and not to go forward with a self-defense theory. Mr. Parrish's performance was not "deficient," as defined by the Supreme Court in *Strickland*; that is, he did not make an error that was so serious as to deprive Mr. Langel of "counsel" as guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Langel's claim on this issue should be denied.

## *CONCLUSION*

In the final analysis, "an accused is only entitled to a fair trial, not a perfect one." *State v. King*, 256 N.W.2d 1, 12 (Iowa 1977) (citing *Schneble v. Florida*, 405 U.S. 427, 432, 92 S. Ct. 1056, 1060, 31 L. Ed. 2d 340 (1972); *State v. Kelsey*, 201 N.W.2d 921, 927 (Iowa 1972)). The court finds Langel has failed to show his trial counsel provided ineffective assistance in either failing to require the trial court to inquire into Langel's waiver of a jury trial, or in failing to assert a theory of self-defense. Langel further has failed to show the decision of the Iowa Court of appeals on these issues either was contrary to or involved an unreasonable application of clearly-established federal law.

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, Langel's petition for writ of habeas corpus be denied.

**IT IS SO ORDERED.**

**DATED** this 11th day of April, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).